Thank you. Matt McClurk, please call the next case. 3S12-060675, Celeste Broder, appellant by David Anditch, v. Michael Giba, appellate by Andre Berthold. Mr. Anditch, you may proceed. May it please the Court. Counsel. Your Honors, my name is David Anditch, A-N-D-I-C-H. I'm appearing on behalf of the petitioner appellant Celeste Broder. As Your Honors know, this is an appeal from a decision by Judge Gregory Chikris in which he ordered a permanent custody award in favor of the respondent Michael Giba. Or Giba, Your Honors, I believe is the correct pronunciation. Before I begin, the real issue with respect to Judge Chikris' custody decision relates to the evidence and whether his decision has some errors in his findings and is contrary to the manifest weight of the evidence. I was speaking to counsel before I began my substantive argument on the evidentiary issue. I would just like to note there's kind of a question out on our side as to whether the jurisdictional issue that was raised by counsel for the appellee through a motion to dismiss, after I had filed my first brief, whether that is still an issue in any of Your Honors' minds. And the reason I'm raising the question at the moment is because the appellee's brief, his first argument, is again the same recital of the law and the argument that I believe this court previously rejected and denied in a motion to dismiss. Therefore, I did not file a reply brief to address that issue because I filed a 13-page objection to his motion to dismiss before we got here. This court made a ruling. It denied his motion to dismiss. I interpreted that as a substantive ruling that this court agreed that it had jurisdiction to decide this appeal. That was my determination or my extrapolation from reading a one-sentence order by this court. Subsequent to that, counsel comes back and files his appellee's brief, his only brief, and his first argument is this court doesn't have jurisdiction. In my view, the argument's been made twice and rejected. And I guess at this point, all I would say to the court is if Your Honors still believe it's a live issue, I don't. But if you do, I mean, obviously it's your choice, not mine. I have a 13-page brief before this court in my objection to the appellee's motion to dismiss. And we'll consider that. Thank you very much. I just wanted to clarify that issue and find out where I stood right at the moment. With respect to the custody ruling, there's no question of law really in this case. It's a very, very simple, straightforward, best interest of the child custody decision in which Judge Shirkus, as I said, awarded custody to Michael Giebel. We raised three issues in our brief. We think the judge has badly misconstrued the evidence that was before him. And the three primary issues that we raised begin with the issue of the stability of the environment that the child has lived in up to the date of the court's ruling. We believe the evidence was absolutely solid that Celeste Broder was the primary caregiver, an issue which this court and other Illinois courts have looked at. For the first 18 months of the child's birth, she's breastfeeding the kid. She's with the kid every day. Donovan is the kid, who's now four at the time of the trial. By her testimony, she has spent 23 out of 24 hours. Mr. Giebel was working 70 hours a week at two jobs in the Quad Cities. It seems metaphysically impossible for Mr. Giebel to have been the primary caregiver for the first 18 months. You then get to this second two-year period, and during that period of time, they are exchanging the child and having every other week-type visitation or custody. You can call it either one, I guess. During this period, this second two-year block, it is mom. It is Celeste Broder who discovers that the child has a testicle problem. It's mom, again, who discovers that the child has a condition called thrush as a result of a very large cut on his tongue. It's mom who believes that there is a problem with diabetes. In all of these instances, it's mom who takes the kid to the doctor, provides the medical care. In the case of diabetes, the testimony and the evidence is she takes him to Dr. Schnurman, the kid's family physician, on one day, and takes Donovan to the Peoria Hospital on the diabetes and has him admitted the very next day. We believe, with respect to this first issue we've raised, that the court has really, really overlooked who the primary caregiver was and the stability of the environment. As part of our argument on that issue, I guess it's a sub-issue, or two sides of the same coin, not only do we point out the stability and the dependency that Donovan had on Celeste Broder for much of that four-year period on a day-to-day basis, but we also take issue with the court's finding, and it's Dr. Hutchinson's finding also in his report, about the stability of these two parents. And the other side of the coin is we submit to this court, as we did to Judge Chikris, that Michael Geba was very unstable at the time. He hasn't been able to get a job. He has a bachelor's degree from Northern Illinois University. He couldn't get a job in the Quad Cities, population 400,000. And your honors are familiar with it, you know the businesses and the industry that we have there. So he can't get a job in the Quad Cities with a bachelor's degree, so he has to move to Allsup, Illinois, by Chicago, with his parents. He then gets into a situation, and the evidence says that he makes $200 a month in his job as a graphic designer, illustrator, whatever, so he's living under the poverty level, but there's also some testimony that he received $1,400 a month from his grandfather for looking after the house that he was living in, which was the grandfather's house. So his income is either $200 a month or $1,600 a month, depending on how you want to look at it, although he didn't file an income tax return to report the $1,400 as income for maintaining the house. So be that as it may, if your honors want to look at stability of these two people, Celeste Broder made a living as a waitress, working two days during the week, throughout lunchtime, and on Saturday night, she supports herself and Donovan, and that evidence isn't disputed. Michael Giba couldn't support himself, let alone Donovan, on $200. You can figure out what the $1,400 is if it's important to the court. But basically, between these two individuals, the far more stable person at the time the trial is going on, in terms of stability of the child and relationship to the child, is Celeste Broder. The second issue we raised that we believe is also a very significant problem created by the trial court relates to Section 5602B, and the court knows about that, and it is a prohibition. When a trial court is determining who the custodial parent is going to be, it prohibits the court from considering evidence of conduct. I think the rule would have been better written if it said misconduct, but it says conduct by the proposed custodial parent if it doesn't have an effect on the child or the parenting relationship of the parent to the child. That rule has been applied in a lot of cases in which there's a history of alcohol or drug abuse. Throughout Illinois, that rule in drugs and alcohol seemed to come up. In this case, the evidence we believe was clear. Celeste Broder, as a teenager, had a problem with drugs. There's no dispute about that. She testified very openly, the judge calls it very candidly, about her abuse of drugs, from LSD to something called mushrooms, and I'm too old to know what they are. Maybe the courts found out about them in another case, and marijuana and alcohol. She candidly admits this problem when she's a teenager, 17, 18, 19 years old. In fact, she's convicted on two different drug charges for possession as a youthful indiscretion, I guess I'll say. But she testifies that by the time she's in her, at the latest, in her early 20s, 20, 21, whatever, she's 34 at the time of the trial, so she testifies that by 13 years before the trial, she's clean. She quit using drugs. She realized what a problem drugs were for her. And she also had an issue, a mental health issue, with cutting herself. And she raises this issue in the trial and testifies that as a very, very young girl, after her grandmother died, she started this practice and actually cut herself on her thigh, a self-inflicted wound, five or six times. She then gets treatment for that, and we maintain that hasn't been an issue. Michael gave us, as you saw, one time in 2007, which would be five years before the trial, cutting herself. Celeste disputes that. But in any event, if you read Judge Chikris's opinion, you see how much he relied on her abuse of drugs and abuse of alcohol. He makes some very, very significant statements there. He uses the word longstanding. He calls, he says that Celeste Broder suffers from a longstanding mental problem, and quote, from longstanding history of drug abuse and addiction. That is not the evidence in these 703 pages of the record. She had a drug abuse issue, which she admits to, 13 years before the trial. There is zero evidence, none, that indicates that her abuse of drugs 13 years ago has any connection to her parenting skills, beginning eight years later when Donovan was born. And if anything, I think she's a terrific mom. And the judge found, I'm not making this up, Judge Chikris found that both parents were very good parents. It's kind of an unusual custody case when you get both that are good parents, and Judge Chikris found both had a loving relationship with Donovan, and vice versa. But there is no evidence of a continuing longstanding. I looked up the word longstanding, and it's interesting, because I was bothered by Judge Chikris's use of it. And one of the definitions in the dictionary is that it reflects a continuous problem, a continuous something, whatever you're talking about that is longstanding. But it clearly suggests that it's an ongoing problem. The evidence here in this case is just the opposite. And then the judge goes from there to a statement I don't think I've ever seen before in 39 years of practicing law, where the judge says that, quote, a relapse is not only possible, but arguably probable, due to the seriousness and longevity of the problems. You cannot support that the judge is finding. And for him, that is absolute speculation. There isn't a word by any of the doctors who testified in this case, or anybody else, that would support the argument that it is arguably probable that there's going to be a relapse. I have no idea where Judge Chikris came up with that. I think it's entirely improper for a judge to engage what has to be total speculation about a crystal ball view of what's going to happen in the future. There's no evidence to support that Judge Chikris is wrong in doing it. Finally, Your Honor, I just want to comment for a moment on what I consider an equally disturbing theory that Judge Chikris came up with. In part of his opinion, and that forms the basis of this decision, he says that my client Celeste Broder has perception problems. Another phrase I've never heard in 39 years in litigation, that a person has perception problems. Judge Chikris comes up with that because he said Celeste Broder testified that Mike passed out at home and was naked with the kid being naked. That she came in on five occasions and saw him masturbating to gay pornography. That Michael engages in excessive compulsive behavior by folding blank sheets of paper and putting thousands of them down the basement that she had to take out. Thank you. And that the sister sees reptiles. I've never heard of the theory. He then ties that to say she can't be a good facilitator for Michael and the kid. She has to be bad if she has these perception problems. I don't know where that's coming from. And I guess Your Honors will have to find out, figure it out on your own. But I don't think it's supported by the evidence. I believe the decision is contrary to the manifest weight of the evidence. And I'm asking this court to reverse the decision. I'm sorry I overstayed my step. It's okay, Mr. Anditch. Thank you. Thank you, Judge. Thank you, judges. Mr. Filippowitz. Good afternoon, Your Honors. May it please the court and counsel. Your Honors, the basic problem here is that if one were to rely only on counsel's recitation of facts as they were put in the statement of facts in his brief, and on the brief recitation of supposed facts that are contained in this past argument, the impression is a misleading one. It is not correct. It is not accurate. Your Honors should note that I took the step of filing a thorough and balanced recitation of facts, which corrects a lot of the omissions. This presentation of the facts is key to this appeal. Before getting into where there is evidentiary support for the judge's ruling, I would like to say that the initial argument that I made is not a throwaway one. The notice of appeal was filed on August 8th after a July 20th ruling, which invited the parties to enter into a joint parenting agreement. The notice of appeal was filed on the 8th. At the trial level, the counsel filed a notice of motion for entry of the joint parenting agreement, which was in fact 14 pages, signed by both sides, signed by their counsel, negotiated, and initialed on each page. It took care of the issues of joint custody, allocation of parenting time, transportation. All of these issues were put into the court order. Judge Chikris correctly found when the parties presented themselves pursuant to notice and pursuant to the previous court order, the order of July 20th, had entered and continued the matter for further proceedings before the trial court on the 29th of August. On that date, the judge, and the record is clear, and it's in my statement of facts, and it's in the minutes of the court's docket, the judge invited the parties to present legal argument as to why or why not he had jurisdiction to entertain the requested entry of the joint parenting agreement. The judge said, I have not heard from anyone about this. I'm making a decision, I'm making a ruling in my capacity as a trial judge that the August notice of appeal was premature because there was still something left hanging before the court. Furthermore, the parties requested the entry of the joint parenting agreement. The situation could be analogous to one where there's been a long and hard-fought case, fought in a personal injury case, where there's been a jury verdict. But the damages have not been entered, the final order has not been entered, and the parties entered into an agreed order disposing of all issues. Significantly, this order did not reserve the rights of the appellant to appeal the case. My contention is, perhaps the court made an initial decision not to dismiss this appeal, wanting to hear further from it. My contention and the alternative in this first argument is that either the appeal should be dismissed as moved or just denied on the basis that there is no case in controversy. Now, moving on to the recitation of facts. Counsel, in this argument and in the brief, invites the court to wade through 702 pages of record and testimony. The decisions of the judge to award the joint custody of the child to the parties, it was a correct one. And the decision to award primary residential custody to my client was also correct and supported by the manifest way of the evidence. The argument of stability. For one, my client, in the statement of facts, introduced evidence of his deep involvement in the child's life during the period of time that the parties resided together. But moreover, after they separated in April of 2010, they had a nine-month agreement, which was for both parties to share custody one week on, one week off. And that worked for a while. When it stopped working, it was because Ms. Broder insisted that my client was not going to see the child except on her terms and under her supervision. She was the first one to go to court to file a motion, allegedly for joint custody, but she indicated in that motion, and it's in the record, that she wanted to have the care, custody, and control of the minor child, so that she would be the one in possession of the child. The stability of the child was that the 50-50 parenting time arrangement, which was found to be all right until such time as the child was going to go to preschool or school, was working out only after my client went in on an emergency motion to restore the status quo. There's an indication in the brief filed by Epelant that the fact that there was this 50-50 parenting time for basically the two years of the child's life was at her behest or acquiescence. It was not. It was part of a court order. The judge's credibility findings have merit. Ms. Broder had made an issue of an alleged incident where my client's mother, who was a pediatric neonatal nurse, allegedly tried to poison the child with an overdose of adult-strength Tylenol. That went to a hearing at trial, and Mrs. Geba testified credibly that she, as a neonatal nurse, weighs the child and breaks down the dosages of drugs of Tylenol by weight, so there was no harm done. The judge's findings as to the credibility are to be given deference, and they are supported by the manifesto of the evidence. The parties prior to trial entered into a stipulation, and that stipulation indicated that the mother was making $2,000 income per month and the father was making $1,700 income per month. That was a factual stipulation. It's now being raised as somehow showing that my client cannot take care of the child. He was able to do so. The trial judge found that my client had marketable skills. He has a bachelor's degree from Northern Illinois University, and he has skills in fine arts, graphics. In point of fact, when counsel is complaining that my client, during the initial period of time that my client was working, was working ungodly hours, he was doing so to support the family. One should take notice of the fact that during the time that my client was unemployed was a time when this economy had plunged into a very deep recession, and it was not all that easy for folks to find employment. My client did his level best to maintain the financial stability of the family. After he was laid off by his employer, he worked for them part-time as an independent contractor. He worked for the YMCA. He's diligent. The custody report is an evidentiary finding. The custody report in and of itself is evidence that went into trial, and the custody evaluator, Dr. Hutchinson, had the occasion to observe the parties with the child, and he found that my client had a more appropriate way of dealing with and disciplining the minor child or young Donovan. The custody evaluator also found that my client had greater stability in his overall stability. That's borne out by the testimony that was adduced by three physicians. Dr. Hutchinson was a Ph.D. psychologist. Mr. Giba's psychologist, Dr. Childs, testified as well, and he testified largely that my client had a brief situational depression brought on by the breakup of the relationship, and then he shifted his focus in the therapy to how best to manage co-parenting with Ms. Broder. The testimony with respect to Ms. Broder's mental health was more disturbing. She had a diagnosis, admitted diagnosis, of bipolar disorder. She had a diagnosis of depression. Her physician, who testified on her own behalf, testified not that she should not be taking medication for her bipolar disorder, but rather that this was the type of a medication that he, as a general practitioner, would not prescribe. He had referred her to the Robert Young Clinic for depression, and pursuant to that referral, a doctor, a psychiatrist there, had prescribed her a variety, a plethora of antidepressant medications. Even though she should have been taking medication, and even though she should have been in therapy, she unilaterally decided to not continue with either therapy or medication. That's a free decision that she can make, but the judge's weighing of the relative mental health of the parties was supported by the manifest way of the evidence. Now, the judge's stated opinion that a relapse would be probable or improbable, that's a matter of shading. However, with respect to the drug issue, there was testimony by Ms. Broder on cross that she had not told the truth to the custody evaluator when she denied that she had smoked any marijuana since the time that the child was pregnant. The testimony by my client was that she continued to smoke it, that she admitted to him that she was fired from her job because she was caught by one of her art curators smoking marijuana while on a job-related trip. And Ms. Broder candidly admitted upon cross-examination that in fact she had not told the custody evaluator the full truth about that particular incident. In conclusion, reading through 702 pages of trial transcript is something that I did. And the standards articulated by counsel in his brief and the standards articulated by me in my brief as far as the legal standards on reviewing evidence are correct. The fact is that in this case, it's not a judgment call that should be made by this court as to whether this evidence should be reweighed or not. There was sufficient, substantial, and good evidence supporting the fact that my client should have residential custody. There was good and substantial evidence that the parties would be able to co-parent. Ms. Broder has not been denied anything. She is participating in joint custody of the child. The more appropriate, the more mature, the more stable, and the more able parent to be able to see to it that this child has a good, decent future is Mr. Giba and physical residential custody was appropriately decided. Do you have any questions, Your Honors? I don't believe we do. Thank you. Okay. Thank you very much. Thank you, sir. Mr. Andes, you may reply. Just a few brief comments, Your Honors. Again, back to the jurisdictional issue that has been raised again. In this argument, I would ask the court to, if it's a live issue and an issue still before you, to read the Supreme Court's decision in In Re Commitment of Hernandez. The state of Illinois is a part of that case. And for all the decisions that have been made, sometimes that aren't so clear from the Supreme Court, this one is extremely clear in the guidance that it provides to the practicing bar and the lower courts. It says, if a trial court judge creates confusion by a series of multiple orders, which is obviously likely to happen, it doesn't say that part, that it's likely to happen in a custody type case, where you have legal custody, you have physical custody, and you have a joint parenting agreement, as the issues that come up. The Supreme Court very clearly, very directly says, in rejecting the state of Illinois' argument on this point, if you have any confusion, if a court creates any confusion by multiple orders, the party who is confused always has a remedy. It then instructs us, as members of the practicing bar, to file multiple notices of appeal. That is exactly what we did after Judge Chikris created the confusion by a docket entry, when nobody was there, no lawyers were present, Judge Chikris says, I don't know if I've got jurisdiction in the trial court, he concludes he does, because he makes a reference to a premature notice of appeal. So when I saw that, months after Judge Chikris had said that, but still within the 30 days from when the joint parenting agreement approved, and I researched and found the Hernandez decision, I filed a second notice of appeal and a motion to consolidate. That is exactly what the Supreme Court said I'm supposed to do. That's what we did, and this court has jurisdiction. And secondly, and I'm surprised my counsel has never mentioned this, not a word, if your honors look at Supreme Court Rule 303, in 2007, the Illinois Supreme Court put in a safety valve to deal with this exact issue. And what the portion of 303 I'm talking about, the sub-portion of the rule, it says that in the event that there is a premature appeal, filed by a practicing lawyer in Illinois, it's no longer going to be considered premature. The rule says that that notice of appeal, whatever date it was filed and sent from the trial court up here, will be considered to have been filed, and the notice of appeal on the date of the last order in the trial court. This is a non-issue. The issue never should have been raised before this court. I've never said this. I didn't file a motion for any type of sanctions or anything like that. But the Supreme Court addressed this exact issue in 2007, and I think it's absolutely proper for this issue to be raised now. So on those two bases, Hernandez and 303, there is no jurisdictional issue, we submit. Just a couple other brief comments. There is no doctor who testified in this case, no medical person who said that my client should be taking medication for any mental condition at the time of the trial. Consul was right that there were prior recommendations that it should be on some drugs. But you've got to look at the history of this case, it covers 10, 11 years if you want to get into drugs and mental health, or 14 years if you want to get into that. There is no evidence at all that says that at the time of this trial, and when custody was decided that she was to be taking any medication, and Dr. Schnurman said, I never prescribed any medication. He says he has a way of doing it by calling a doctor, because he's a DO and can't prescribe medication. He calls a doctor and tells him. Dr. Schnurman doesn't say that he ever did that. And with respect to this issue, again, of stability, I continue to be bewildered. Yes, there was a stipulation that his client, Mr. Giba, had an income of $1,700, but the evidence is unrefuted in the record. It says that $1,700 is actually $1,600, $200 of which he earns by being a designer, an illustrator, and a cartoonist. $200 a month is what he really earned, and his grandfather gave him $1,400. And that's how the stipulation became $1,700 actually. It should have been $1,600. That isn't stability for a kid. That's not an ability to support your child. The real income of the person is $200, and the best evidence that that's his real income is Mr. Giba didn't report the $1,400 a month and didn't file an income tax return. So I hope the court will read the evidence very carefully on stability. We can submit it is against the manifest way of the evidence and that this decision should be reversed. Thank you very much. Thank you, Mr. Anditch and Mr. Filipowicz, for your arguments in this matter this afternoon. It will be taken under advisement. A written disposition shall issue. The court will stand in brief recess.